FIRST NATIONAL BANK OF LEXINGTON, APPELLANT, V. ROY
    D. ANDERSON ET AL., APPELLEES: ELEANOR J. BAKER,
    INTERVENVER, APPELLANT.

FILED MAY 16, 1921.    No. 21219.

1. **Process: RETURN: IMPEACHMENT.** After judgment, the sheriff's return of service of summons can only be impeached in a collateral proceeding by clear and convincing evidence.

2. ———: ———: ———: PROOF. Where a sheriff, whose return recites that he served a summons on defendant by leaving a copy at his usual place of residence, testifies to the specific acts on which the return was based, the validity of the service is determined by a preponderance of the evidence, but such preponderance requires proofs of a clear and convincing nature.

3. ———: ———: ———: SUFFICIENCY OF EVIDENCE. Evidence outlined in the opinion *held* to require a finding that the sheriff did

not leave a copy of the summons at the defendants' place of resi-
dence, as recited in the return, and that the defendants did not
have actual knowledge of the suit.

APPEAL from the district court for Lincoln county:
HANSON M. GRIMES, JUDGE. *Reversed.*   .

*Hoagland & Hoagland* and *E. E. Carr,* for appellants.

*Halligan, Beatty & Halligan, W. T. Wilcox,* and *Beeler
& Crosby, contra.*

ROSE, J.

This is a suit in equity to redeem a quarter section of
land in Lincoln county from a sheriff's sale in a suit to
foreclose a mortgage. When Samuel A. Thomas and
wife owned the land September 22, 1914, they mortgaged
it to H. Bruce Kriger to secure the payment of a note for
$1,000 bearing interest at the rate of 10 per cent. per
annum until paid. With the land thus incumbered they
deeded it to Eleanor J. Baker February 11, 1915, and she
and her husband, Dr. B. Baker, deeded it to the First Na-
tional Bank of Lexington February 24, 1915, under an
agreement obligating the bank to reconvey the land to its
grantors upon payment of debts which their deed had been
given to secure. The deeds from the Thomases to Eleanor
J. Baker and from the Bakers to the bank were not re-
corded. Silas Burcham used the land as a tenant. An
instalment of interest due to Kriger being unpaid October
10, 1916, he then commenced a suit to foreclose his mort-
gage, making the Thomases and the Bakers the only de-
fendants. There was personal service of summons on the
Thomases and the return of the sheriff recited that he
served it on the Bakers by leaving a certified copy for
each at their usual place of residence. Upon the default
of defendants a decree of foreclosure was rendered De-
cember 20, 1916, the amount then due on the mortgage
being $1,261.10. The land was appraised February 21,
1917, at $3,040, and sold by the sheriff to the Union
Realty & Investment Company April 16, 1917, for $2,030.

The sale was confirmed and the sheriff's deed was executed May 15, 1917. The purchaser at the sheriff's sale sold the land to Roy D. Anderson September 1, 1917, for $3,800, received $1,000 in cash and took a mortgage for $2,800. Anderson went into possession immediately and made valuable improvements.

The First National Bank of Lexington, being the holder of the legal title under a conditional obligation to reconvey the land to the Bakers, and not having been made a party to the foreclosure proceeding, commenced the present suit December 7, 1917, to redeem the mortgaged land from the sheriff's sale and to cancel the subsequent conveyance and the subsequent mortgage given to secure the remainder of the purchase price. Eleanor J. Baker, being entitled to a reconveyance from the bank upon payment of the debts which her deed to the bank was given to secure, intervened as a defendant in the suit to redeem the land and prayed for the relief sought by the bank. Upon a trial of the issues raised by the pleadings, the actions by both the bank and the intervener were dismissed and the title to the land was quieted in Anderson, the grantee of the purchaser at the sheriff's sale. The bank and the intervener have appealed.

The bank was not a party to the foreclosure and contends that it is not bound by that proceeding. The intervener pleads that she and her husband, though named as defendants in the foreclosure suit, were not served with summons therein; that they had no notice or knowledge of the pendency of the foreclosure suit, and that they are entitled to redeem their land. How these pleas should be determined under the evidence is the controlling question presented by the appeal. In this inquiry in the appellate court the statute requires an independent conclusion upon consideration of all of the evidence, "without reference to the conclusion reached in the district court or the fact that there may be some evidence in support thereof." Rev. St. 1913, sec. 8198.

As already stated, the return of the sheriff recites that

he served the summons upon the Bakers by leaving a certified copy for each at their usual place of residence. The burden was on them to impeach that return. That could only be done by clear and convincing proof. In performing his official duty the sheriff acted under an oath of office and under the penalties of an official bond. There is a presumption that he performed his duty. The enforcement of contracts, the integrity of judicial proceedings, and the disturbing of titles are impressive factors in the impeachment of a sheriff's return after judgment. At the same time courts, in a foreclosure proceeding, cannot strip landowners of title without notice to them. A sheriff's return is not beyond judicial scrutiny.

In the present case the sheriff testified as a witness to the specific acts on which his return is based. The validity of the service, therefore, under recent rulings, is determined by a preponderance of the evidence. *Janous v. Columbus State Bank,* 101 Neb. 393; *Racine-Sattley Co. v. Popken,* 102 Neb. 635. Such a preponderance, however, requires proofs of a clear and convincing nature.

Tested by the standards mentioned, did the sheriff serve the summons on the Bakers? He testified that he left a copy for each at one of the rooms in the Ritner Hotel, at North Platte, October 21, 1916. He had no personal knowledge that they resided there. He had been directed by Kriger's attorney to make service at that place. Neither of the Bakers was at the Ritner Hotel when the sheriff called. He was asked why he left the copies there, and answered: "There were two ladies there and one was Mrs. Smith, and she told me the room he (Dr. B. Baker) occupied there at that time and that he was not at the hotel." The "Mrs. Smith" to whom reference is thus made testified, in substance, that she was manager of the Ritner Hotel; that soon after the middle of September, 1916, Dr. Baker settled his bill and took his things away; that Mrs. Ritner had moved his things out of the room which he had occupied, and that he had said he would leave; that he stated he was going to the McCabe Hotel;

that a drayman took his things away from the Ritner Hotel; that thereafter he did not stop at the Ritner Hotel; that witness found a paper under the door of the room formerly occupied by him, but he was not there at the time and his effects had been moved away. Both the proprietor and the clerk of the McCabe Hotel testified that Dr. Baker came there September 15 or 16, 1916, and made reservation for a room. One witness said that Dr. Baker expressed his purpose to make his home there, and stated that he would be absent most of the time for a few weeks. At that time his trunk, his wife's sewing machine and a cabinet, which had been at the Ritner Hotel, were delivered at the McCabe Hotel, where they were stored in the basement.

Dr. Baker testified, in substance, that he was not residing at the Ritner Hotel when the summons was left there; that he had previously left and did not return; that he had changed his residence to the McCabe Hotel; that he did not receive the summons; that he did not know it had been left at the Ritner Hotel; that he never knew of the pendency of the foreclosure suit until the fall of 1917; that he first learned of it when he called on the tenant for rent.

There is uncontradicted evidence that the Bakers formerly lived at Lexington, but changed their residence to North Platte; that thereafter Dr. Baker was engaged in the insurance business; that he spent most of his time traveling and was not regularly in his room at the Ritner Hotel or at the McCabe Hotel during the year 1916.

For the purposes of this inquiry the testimony of Mrs. Baker may be summarized as follows: Her home in Lexington was sold in February, 1915, and thereafter she remained at the home of her mother in Denver until December, 1915, when she went to the residence of her husband at the Ritner Hotel. She stayed there until her mother had a stroke of apoplexy April 5, 1916. The next day she went to Denver; returned to North Platte in May for her trunk; remained one night; went back to Denver

and stayed until November 20 or 21, 1916. She then came back to North Platte; was there a few days, and again went to Denver and stayed with her mother until July, 1918. She had no notice of the foreclosure suit and first learned of the difficulties about her land in 1918.

The land was mortgaged for $1,000 only. It was appraised before the sheriff's sale at $3,040. It was sold by the sheriff for $2,030, and a few months later by the purchaser for $3,800. It is not likely that owners of land of such value would knowingly and willingly permit it to be sacrificed for the satisfaction of so small an indebtedness.

While, in some minor particulars, the proofs tending to impeach the sheriff's return are contradicted, there is little reason to doubt that the Ritner Hotel was not the residence of the Bakers when the sheriff left copies of the summons there, or to doubt that they did not have notice of the foreclosure in time to protect their rights. It is certain that the residence of the Bakers was once at the Ritner Hotel, but any presumption of its continuance there fell as soon as the substantial evidence of a change was adduced.

There is proof tending to contradict the testimony that Dr. Baker had paid his bill in full when he left the Ritner Hotel, but, when considered with the record as a whole, it does not disprove the case made by the intervener on the invalidity of the sheriff's return.

There is also proof tending to show that Dr. Baker once registered at the Ritner Hotel after he removed his trunk and other property therefrom, but this is contradicted by direct and positive testimony. In any event, considering such proof as verity, the proper inference, in the light of all of the circumstances, is that he was then merely a transient guest as distinguished from a resident.

An attorney for Kriger testified to facts tending to prove that Dr. Baker learned of the foreclosure suit while it was pending, but the latter denied such knowledge. In any event Mrs. Baker, who owns the equity of redemption,

First Nat. Bank v. Anderson.

testified that she did not know of the difficulties about her land until 1918. This is uncontradicted and actual knowledge is not imputable to her.

From evidence that fully meets the requirements of the law in cases of this kind, the conclusion is that the summons was not served on the Bakers, and that they did not have actual knowledge of the foreclosure in time to protect in that litigation their interests in the land in controversy. It follows that the Bakers and the bank are entitled to redeem, and to have the decree of foreclosure, the sheriff's sale, the sale to Anderson, and the latter's mortgage canceled, upon equitable terms. Anderson should be required to account for the rents and profits during his tenure, and further evidence may be taken to determine the amount for which he is accountable. Otherwise the final decree should be based on the record as it now stands. The district court should exact of the Bakers and the bank the equitable terms proposed by the following offer in their brief in the supreme court:

"These appellants are willing to do equity, and are willing to allow the defendant Anderson for his improvements, and require him to account for the rents and profits of the premises, and have the same applied thereon and require whatever balance there may be due to be paid into court by these appellants. The mortgage to the Union Realty & Investment Company should be canceled. Anderson should be reimbursed for the moneys which he has advanced to Patterson, with interest thereon, and Patterson should have the balance that is due him which he paid on the sale, with interest."

For the purposes of redemption on the equitable terms outlined herein, the judgment of the district court is reversed and the cause remanded for further proceedings.

                                        REVERSED.